IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ANGELA DICKERSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **06-988-DRH-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

**PROUD, U.S. Magistrate Judge:**

Angela Dickerson's application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382 was denied in April 2006 by Administrative Law Judge James E. Craig. (R. 14-22). In October 2006, the Social Security Administration Appeals Council declined to review ALJ Craig's decision, thereby rendering it the final Agency decision. (R. 6-8). Dickerson now seeks review pursuant to 42 U.S.C. § 405(g). (Doc. 2). This Report and Recommendation is respectfully submitted to Chief United States District Judge David R. Herndon in accordance with 28 U.S.C. §§ 636(b)(1)(B) and (C).

Plaintiff contends the ALJ's decision was arbitrary and capricious, based upon an incorrect legal standard, and not based on substantial evidence. (Doc. 2). In her brief (Doc. 12), captioned as a motion for summary judgment, plaintiff elaborates that the combined effects of cervical and lumbar spinal injuries, bilateral carpal tunnel, depression and the resulting pain have left her disabled and unable to work since August 1, 2002. Plaintiff contends it was error to discount plaintiff's treating physician Dr. Gay Richardson's opinion. From plaintiff's

perspective, Dr. Richardson's opinion of plaintiff's residual functional capacity is consistent with objective medical evidence and the treatment record as a whole. The absence of specific notations regarding work-related restrictions is attributed to the fact that plaintiff had not been working. Plaintiff cites repeated complaints of increasing pain, her need for medication, the absence of evidence of sustained improvement, the side effects of medication and her psycho-social limitations as sufficient evidence for a finding of disability. Plaintiff likens her situation to that presented in *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004). In *Carradine*, the appellate court cautioned against being dismissive of subjective complaints of severe pain with a psychological component, merely because there is a lack of objective evidence, even when there is seemingly contradictory evidence of sporadic physical activity, particularly in light of a protracted history of complaints of pain and a long treatment and medication history.

The defendant's brief generally counters that there is sufficient evidence to support the ALJ's decision, which, on its face, offers an adequate explanation for discounting part of Dr. Richardson's opinion about plaintiff's ability to perform work-related activities. (Doc. 15). Defendant highlights the lack of notations in the record reflecting limitations on plaintiff's activities, or advice not to engage in work-like activities. From the defendant's perspective, over time and with medication, plaintiff's condition has improved, and the objective and subjective evidence in the medical records simply do not support her subjective complaints of pain and physical impairment. Defendant also puts great stock in the standard of review, noting that in accordance with *Herr v. Secretary of Health and Human Services*, 912 F.2d 178, 181-182 (7th Cir. 1990), an ALJ's credibility finding will be affirmed unless it is patently wrong.

# Synopsis of the Relevant Procedural Record and Evidence

Plaintiff Angela Dickerson was born July 22, 1968; she has a tenth grade education, and as of January 2005, she lives with her husband, three teenaged children, her daughter-in-law and three month old grandchild.  (R. 426 and 429-430).  The alleged onset of disability is August 1, 2002.  (R. 117).  Prior to claiming disability, plaintiff had worked for approximately two months as a housekeeper at a hotel.  (R. 123 and 158).  For merely historical reference, the genesis of her physical problems appears to be a 1991 motor vehicle accident.  (R. 334).  Plaintiff was primarily treated by three doctors who worked together, Dr. Robert P. Merriweather, Patrick J. Cafferty and Gay B.  Richardson.[1]  Two evidentiary hearings were conducted prior to the decision to deny plaintiff SSI– one in January 2005 (R. 390-419), a second in January 2006 (R. 420-449).

As of the alleged onset date, plaintiff was post- anterior cervical discectomy and fusion in March 2001 (R. 163-170), right carpal tunnel release in March 2001 (R. 163-170), and left carpal tunnel release in February 2002 ((R. 177-181).  After conservative treatment for lumbar radiculopathy, plaintiff subsequently underwent a lumbar laminectomy with foraminotomy of the nerve roots at L5-S1 in October 2002 (R. 189-195).  In March 2004, in connection with her disability application, a psychological assessment indicated plaintiff also has a mood disorder, secondary to her medical conditions, with major depressive-like features, as well as a pain disorder with psychological factors.  (R. 333-335).

---

[1]The medical notes generally attributed by the parties to be from Dr. Merriweather often indicate they were by both Doctors Merriweather and Cafferty, and even then, notations indicate the notes were dictated by Dr. Cafferty.  (R. 285-332). Accordingly, in most instances this Court has referenced Dr. Cafferty's name.

An MRI in September 2001, approximately six months post cervical discectomy and fusion, revealed neural stenoses at C5-C6 and C6-C7 (on the right side), and no evidence of further cervical disc herniation. (R. 187-188). After a fall and complaints of recurrent neck pain, an additional MRI was taken in October 2001, which showed an intact fusion at C5-C6 with some degenerative changes at C5-C6 and C6-C7. (R. 305). In the fall of 2001 an MRI of plaintiff's lumbar spine also showed disc protrusion at L5-S1 with mild mass effect and mild encroachment on the right L-5 nerve root, but no evidence of nerve root impingement; multilevel mild facet arthrosis was also observed. (R. 185-186).

February 1, 2002, treatment notes reflect that plaintiff's lumbar back pain was continuing to trouble her, and that she was being treated with analgesic medication, but in the opinion of Dr. Patrick Cafferty, plaintiff "will more likely than not, require surgical intervention." (R. 304). It is at this same time the left carpal tunnel release was performed. Two months later, in April 2002, the bilateral release procedures were an apparent success, in that Dr. Cafferty noted that plaintiff was crocheting in his office, exhibiting good strength and dexterity. (Doc. 303). Relative to post-cervical discectomy and fusion, the doctor observed that plaintiff had residual neck discomfort, which was "tolerable." (R. 303). Plaintiff's lumbar herniation was not causing substantial problems at that time. (R. 303). Plaintiff inquired about returning to work activities as a cook on a river vessel, and the doctor confirmed that would be fine. (R. 303).

In May 2002, one month after essentially being cleared for work activity, plaintiff returned to the doctor with complaints of back pain. (R. 302). Plaintiff's cervical range of motion was mildly diminished, she had low back tenderness that was aggravated with motion, there was evidence of sensory changes on the right, and her gait was mildly antalgic. (R. 302).

Physical therapy and medication was deemed the first course of treatment, and if that failed, surgery would be considered. (R. 302). As noted above, plaintiff began work as a hotel housekeeper in June 2002, and she returned to the doctor in July complaining that work was aggravating right shoulder pain. (R. 301). Plaintiff continued to have similar problems in July. (R. 300). It is at this juncture, as of August 1, 2002, that plaintiff stopped working and claimed the onset of disability.

By October 2002, plaintiff was not getting pain relief from Lortab 7.5 and Soma, her back pain was radiating down her right leg to her heel and causing foot numbness; she was only comfortable lying down. (R. 300). An MRI revealed (again) a small disc protrusion on the right at L5-S1, consistent with her complaints and the clinical findings. (R. 300). Although she was advised surgery should be a last resort and, given her obesity, it would not likely end her back pain, plaintiff found her situation intolerable and elected to have surgery. (R. 299).

In January 2003, approximately three months post lumbar surgery, an MRI report reflected degenerative changes at L4-L5 and L5-S1, no significant bulging or herniated discs, but a suspicious focalcentral disc protrusion at L4-L5. (R. 324). Plaintiff repeatedly complained of back pain between January and April 2003, which was consistent with clinical observations. (R. 294-298). In April 2003, plaintiff was referred to Dr. Gay Richardson. (R. 296). At that time, plaintiff rated her pain as eight on a zero-to-ten scale, with numbness and tingling of her right lower extremity down to her toes, all of which was causing a sleep disturbance. (R. 296). A May 2003 EMG/NCV study suggested mild right L-5 radiculopathy– ongoing nerve damage at the surgical level. (R. 293 and 319). That test result was characterized as being consistent with the aforementioned clinical observations. (R. 293). Plaintiff was described as doing well with

only Lortab, and sleeping better with Neurontin.  (R. 293).  However, one month later, in June

2003, plaintiff complained that her medications were not providing good pain coverage.  (R.

292-293).  Her sleep problem, pain and radiculopathy were deemed unchanged.  (R. 292).  At

this same time, plaintiff attempted to take-up delivering newspapers, but she found it increased

her pain.  so she was going to attempt to sell Avon products.  (R. 292).  In August, plaintiff was

switched from Lortab to Percocet and Soma.[2]  (R. 290).

In October 2003, two months after beginning her new medication regimen, plaintiff

reported she was doing very well in terms of pain, albeit at plaintiff's request, she was prescribed

a  TENS unit and switched back to Lortab.  (R. 291).  However, it was also noted that plaintiff

continued to have radiating back pain with numbness and tingling, so epidural steroid injections,

surgery and medication were all discussed and plaintiff preferred to continue with medication.

(R. 290).  A few days later, plaintiff hurt her right shoulder lifting boxes while moving.  (R. 202-

204).  X-rays showed significant degenerative changes and a calcified granuloma; Flexeril was

prescribed.  (R. 203 and 206).

An Activities of Daily Living Questionnaire completed by plaintiff on October 27, 2003,

indicates pain in her lower back was nine on a zero-to-ten scale; she experiences weakness in her

hands and loss of strength; she cannot lift over her head with her right arm; she cannot sit or

stand for long periods; she cannot climb stairs; she experiences fatigue; she only performs

minimal chores; and she does not drive.  (R. 134-136).

_____

[2]For general reference, Lortab is a narcotic analgesic indicated for moderate to
moderately severe pain; Percocet is also a narcotic pain reliever– a combination of Oxycodone
and Acetaminophen– indicated for moderate to severe pain; Soma is a muscle relaxer, and
Neurontin is taken with other medication for neuralgia.  (*See*
www.nlm.nih.gov/medlineplus/druginfo  and www.dailymed.nlm.nih.gov).

Shortly thereafter, in November 2003, plaintiff experienced a dramatic increase in pain, which necessitated an emergency room visit. (R. 288-289). An MRI again showed evidence of a small disc protrussion in the lumbar spine. (R. 323). A CT scan in December showed a mild broad-based bulge of the disc at L3-L4, central and left paracentral disc protrusion and suggested early extrusion at L4-L5; minimal new disc bulging/protrusion was observed at L5-S1 (the surgical site), causing mild anterior thecal sac effacement. (R. 321). A lumbar myelogram showed evidence of possible central and left focal disc protrusion at L4-L5. (R. 322). Nerve conduction studies did not show mild right radiculopathy, as suggested by studies in April 2003. (R. 315).

In response to continued complaints of severe pain, and in light of the aforementioned testing, in December 2003 Dr. Richardson switched plaintiff to Dilaudid.[3] (R. 288). According to January 2004 treatment notes, plaintiff's pain persisted to the level it had been pre-surgery; medication was helpful but not long lasting. (R. 286). Plaintiff continued to experience radiating pain in February 2004, essentially unchanged, albeit with some relief from Percocet. (R. 285). In March 2004, plaintiff saw Dr. Vittal V. Chapa for a consultative exam in connection with her disability application. (R. 336-341). Dr. Chapa recognized chronic low back pain, chronic neck pain, limited range of motion fo the lumbosacral spine and cervical spine. (R. 338). Plaintiff was also found to have fairly good grip strength bilaterally and the ability to perform fine and gross manipulation bilaterally. (R. 338 and 341).

By May 2004, plaintiff was stable on her medication. (R. 366). In July 2004, plaintiff

_____

[3]For general reference, Dilaudid is an narcotic analgesic for relief of moderate to severe pain. (*See* www.nlm.nih.gov/medlineplus/druginfo and www.dailymed.nlm.nih.gov).

was described as doing very well overall, with minimal back pain, and she was satisfied with her medication, although her reflexes were absent at her right ankle. (R. 365-366). Medical notes from the end of September indicate plaintiff was "doing a little worse," medication was not controlling her low back pain, which plaintiff characterized as nine on a zero-to-ten scale. (R. 364).

When plaintiff experienced hand tingling in November 2004, a nerve conduction study showed evidence of mild median neuropathy at her wrists, bilaterally. (R. 369-370).

In January 2005, Dr. Richardson produced a medical source statement in connection with plaintiff's disability application. (R. 367-368). According to that statement, plaintiff could lift 10 pounds occasionally; occasionally reach bilaterally; occasionally handle and finger; stand/walk occasionally; sit frequently; had an assortment of postural and environmental limitations. (R. 367-368). According to Dr. Richardson, plaintiff could sit or stand for four to five hours out of an eight hour work day; she would need to recline during the day for 15 minute periods every two hours; she was not deemed able to complete a 40-hour work week; and plaintiff would experience good and bad days, but would likely be absent three days per month. (R. 368). All of the aforementioned limitations were attributed to right radiculopathy at L5-S1, pain syndrome and a sleep disorder. (R. 368).

In January 2005 plaintiff testified that Dr. Richardson had instructed her to do what activities she was able to do, and no specific limits were set. (R. 399). Plaintiff indicated she was unable to lift 10 pounds, but she could lift a gallon of milk (8.5 lbs.). (R. 400).

According to plaintiff, her back impedes her daily activities, leaving her laid up for three or four "bad" days per week, where she is essentially laid up and unable to do anything. (R.

403). Plaintiff indicted her medications made her "fuzzy," and occasionally even seemed to cause her to imagine things; therefore, plaintiff only drives on the rarest of occasions. (R. 402-404). Plaintiff's husband helps with the shopping and must assist her in and out of the tub, because she has difficulty bending and lifting. (R. 404-405 and 408). If she showers, plaintiff must sit on a stool. (R. 408). Although she described her carpal tunnel symptoms as worsening since her surgeries in 2002, plaintiff is still able to crochet "very little," for thirty minutes to one hour per day. (R. 406). Gripping is painful for plaintiff, and she testified that she dropped things. (R. 407). Plaintiff described having to sit or rest for 10-20 minutes after brief periods of exertion, such as while grocery shopping. (R. 405). Plaintiff estimated she was able to walk for 15-25 minutes on a "good" day, and only 10 minutes on a "bad" day. (R. 409). Plaintiff described being able to sit for only 20 minutes at a time, due to back pain. (R. 409).

In May 2005, an MRI indicated moderate compression of the thecal sac at L4-L5, secondary to a small broad-based central disc protrusion combined with facet atropathy and congenital narrowing of the spinal canal; as well as mild degenerative changes with minimal posterior diffuse disc bulges at L3-L4 and L5-S1. (R. 87-88). A loss of height and signal between the intervertebral discs was noted. (R. 87).

In June 2005, Dr. Charisse H. Barta performed a neurology consultation. Although plaintiff had full strength bilaterally, she was found to have low back pain with S1 radicular syndrome, bilaterally. (R. 86). Dr. Barta opined that, since plaintiff had tried all treatment modalities (therapy, medication , but not epidural blocks due to a medical issue) without success, plaintiff should consult a surgeon. (R. 85-86).

Medical notes reflect that plaintiff continued to complain of back pain. In July 2005, Dr.

Shan Bendi observed tenderness at L4-L5-S1, as well as muscle spasms. (R. 81). In August, plaintiff reported some pain and discomfort and tenderness was again appreciated by the doctor. (R. 79). Plaintiff was prescribed an increased dose of Elavil.[4] (R. 79). Notes from September 2005 indicated that, although plaintiff's back pain continued, she was not experiencing numbness and tingling. (R. 76-77). Plaintiff was advised to cut down her doses of Lortab and add Daypro in between; and her Elavil dosage was increased again, and Risperdal was added.[5] (R. 77). Medical notes for September through December 2005 similarly reflect consistent complaints of back pain and continued treatment with medication. The treatment notes indicate plaintiff was returned to her full Lortab dosage. (R. 68-69, 72 and 74). Lastly, medical records indicate that in December 2005 plaintiff fell, landing on her left knee, which caused continued pain and swelling. (R. 66-67).

When plaintiff testified in January 2006, she testified that she was experiencing the same symptoms with respect to her hands that she had prior to her surgeries, and she wore hand braces at night. (R. 428 and 437). She described numbness and tingling in her hands, and difficulty gripping, and dropping things. (R. 429). Plaintiff considered her back pain to be worsening and including numbness, with the right side being worse than the left. (R. 432). Plaintiff also indicated she falls at least once per month because her legs give out. (R. 438). Plaintiff perceived that cold adversely effected her hands and back. (R. 429). Plaintiff also described

---

[4]For reference, Elavil is an antidepressant. (*See* www.nlm.nih.gov/medlineplus/druginfo and www.dailymed.nlm.nih.gov).

[5]For reference, Daypro is an NSAID; Risperdal is an anti-psychotic that may also be used for depression symptoms. (*See* www.nlm.nih.gov/medlineplus/druginfo and www.dailymed.nlm.nih.gov).

difficulty sleeping due to discomfort and not helped by medication.  (R. 432).

Plaintiff testified that her husband performed most of the household chores.  (R. 434). Plaintiff indicates she was able to carry her three month old, twelve pound  grandchild a short distance, but she had trouble buttoning the child's clothes.  (R. 430 and 433).  However, plaintiff also stated lifting caused neck pain.  (R. 440).  Plaintiff reported she had not done needlework in four or five months because of pain.  (R. 434).  On a "good' day, she can read for a couple of hours.  (R. 435).  According to plaintiff, she has daily crying spells, but her doctor has not recommended she see a psychiatrist or psychologist.; current medication seems to help somewhat with her emotions.  (R. 435).  Plaintiff also stated that Lortab made her sleepy.  (R. 435).

Plaintiff stands 5' 2" tall, and during the relevant time period her weight has ranged between 235 pounds and 185 pounds.  (R. 60, 397 and 431).  According to plaintiff's January 2006, testimony, she weighed 190 pounds at that point.  (R. 431).

Plaintiff's lengthy medication history from Walgreens Pharmacy is contained in the record. (R. 373-384).

During the 2006 evidentiary hearing, medical expert Tom Wagner testified about plaintiff's psychiatric situation.  According to Wagner, plaintiff's mood disorder, which is connected to her general physical condition, has a mild impact on her daily activities, mild to moderate impact on social functioning, and mild to moderate impact on concentration, persistence and pace.  (R. 442-443).  Plaintiff had no episodes of decompensation.  (R. 443). Wagner indicated plaintiff should avoid face-to-face interaction, fast-paced activity involving speed and/or quotas.  (R. 443).  Plaintiff cannot perform detail-oriented work, as mistakes will be

made. (R. 444). Plaintiff also needed to avoid noise and distraction, machinery, scaffolding and the like. (R. 444).

During the 2005 evidentiary hearing, vocational expert Stephanie Barnes was presented with a series of progressive hypotheticals, all premised upon a person of plaintiff's age, with her education and vocational background. If that person had the functional capacity for light and sedentary work, but could not perform repetitive pushing and pulling in al extremeties, could only occasionally stoop or crouch, could not kneel or crawl, could not be exposed to extreme heat or cold, had to avoid exposure to fumes and the like, and could not be exposed to moving machinery, Barnes opined that jobs such as order clerk, surveillance systems monitor and information clerk could be performed at both exertional levels– all jobs were available in large numbers in the Illinois and national economy. (R. 414).

According to Barnes, the majority of the aforementioned jobs would be eliminated if a sit/stand option were added, where the person had to shift position every 15 -20 minutes. (R. 415). If the person had to leave the workstation two or three times per day in addition to breaks in order to rest for 30 minutes to an hour, all jobs would be eliminated. (R. 415). Similarly, if that person missed three days per month, or could not work for eight hours per day for a 40 hour work week, no jobs would be available. (R. 416). If the standard hypothetical included a restriction regarding only occasional reaching, fingering and handing, most of the jobs would be eliminated, but the security jobs would be reduced by approximately 90%. (R. 416). Barnes also opined that taking narcotic pain medication as plaintiff described, and being less than clear-headed, would be inconsistent with performing most of the aforementioned jobs. (R. 417).

At the 2006 evidentiary hearing vocational expert Lowell Latto testified. Latto opined

that a person of plaintiff's age and with her education and vocational background, limited to sedentary work, with the restrictions indicted in Dr. Richardson's January 2005 assessment, could not perform sustained work, due to the need to recline during the work day and missing work three days per month. (R. 446). If those two restrictions were removed, Latto thought such a person could perform sedentary, unskilled jobs, such as information clerk, order clerk or security monitor, as vocational expert Burnes had described. (R. 446). Latto confirmed that the inability to work 8 hours per day, five days per week would, obviously, be less than full-time work. (R. 447). Latto also opined that the need to lie down or rest for 15 minutes two or three times per day would preclude work. (R. 447). With respect to the security monitor jobs, Latto testified that those jobs could not be performed if there were serious impairment in concentration. (R. 447-448). He also noted that information clerk jobs requires one to deal with people, although some such jobs can be performed over the phone. (R. 448).

### ALJ Craig's Decision

ALJ James E. Craig found that plaintiff had not performed any gainful activity at any relevant time. (R. 16).

Plaintiff was found to have cervical spine disorder, lumbar spine disorder, residuals of bilateral carpal tunnel syndrome, and depression. (R. 16). The ALJ recognized that, post surgeries, plaintiff continued to experience intermittent neck and back pain and occasional numbness in her upper extremities. (R. 16). The AlJ accepted that plaintiff's depression was linked to her chronic pain and discomfort, but he noted that her mood disorder was mild, resulting in mild limitations. (R. 16). ALJ Craig concluded that those impairments were "severe," but individually or in combination they did not meet or equal one of the presumptively

disabling impairments in 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A. (R. 16-17).

The ALJ found that plaintiff had the residual functional capacity for sedentary work. (R. 17). More specifically, plaintiff was deemed capable of lifting and carrying 10 pounds, stand and walk for up to two hours, and sit for up to six hours in an eight hour day. (R. 17). Plaintiff was limited to no more than occasional stooping and crouching; and she should never kneel, crawl, or repetitively push and pull with her upper extremities. (R. 17). Temperature extremes, moving machinery, unprotected heights and noxious fumes and odors are all to be avoided. (R. 17). Plaintiff should also avoid work involving carrying out detailed instructions or making complex decisions, sustained public interaction, fast-paced work and noisy environments. (R. 17).

Among his conclusions, ALJ Craig noted that plaintiff had reported no adverse side effects from her prescribed medication. (R. 17). The ALJ did conclude that plaintiff's condition could be expected to produce her alleged symptoms. (R. 17). However, the ALJ found plaintiff's statement concerning the intensity, duration and limiting effects of the symptoms not entirely credible. (R. 18).

ALJ Craig generally summarized plaintiff's treatment history. (R. 18-19). Landmarks highlighted by the ALJ include that in August 2004, plaintiff had slipped while painting (R. 18); September 2004 treatment notes reflect that plaintiff only had minimal complaints of back pain, and that plaintiff acknowledged she was doing very well overall, and she was satisfied with the level of pain control (R. 18); and in November 2004, although plaintiff complained of increased numbness and tingling in her hands, tests showed only mild median neuropathy of both wrists (R. 19). The ALJ observed that after Dr. Richardson's January 2005, assessment, plaintiff did

14

not receive treatment again until March 2005. (R. 19). Ongoing intermittent treatment through December 2005 was acknowledge by the ALJ, but he pointed out that no specific limitations were imposed on plaintiff's ability to engage in work-related activities. (R. 19).

Based on the expert medical testimony given by Dr. Tom Wagner relative to plaintiff's psychological condition, ALJ Craig concluded that, although plaintiff had mild limitations on her activities of daily living and mild to moderate limitations maintaining social functioning, concentration, persistence and pace, plaintiff had not satisfied a listed presumptively disabling psychological condition (R. 19)– a finding that is not disputed by plaintiff at this juncture. The ALJ recognized that plaintiff takes antidepressants, but also noted that plaintiff had received no other ongoing mental health treatment. (R. 19).

ALJ Craig ultimately concluded that the objective evidence did not support plaintiff's allegations of disability. (R. 19). The ALJ recognized plaintiff's ongoing back pain upon strenuous activity, but characterized plaintiff as doing fairly well postoperatively, with an improved level of pain, at least as of late 2003 and into 2004. (R. 19-20). The ALJ cited plaintiff's activity painting, not using assistive devices, no additional surgery, and no claimed side effects from medications. (R. 20).

The ALJ discounted Dr. Richardson's assessment, primarily because she did not set forth any work-related limitations in her treatment notes prior to January 2005. (R. 20). Rather, according to the ALJ, the treatment notes showed improvement in plaintiff's pain level; medications improved plaintiff's symptoms significantly. (R. 20). Therefore, the ALJ only gave the doctors assessment some weight. (R. 20). The ALJ ultimately concluded plaintiff had the residual functional capacity for at least some sedentary work activity. (R. 20).

15

Based on a restricted sedentary functional capacity, the lack of a relevant work history, and because she is characterized as a "younger" individual with a limited education, the ALJ found that plaintiff was not disabled, in accordance with Medical Vocational Guidelines (20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 1, Rule 201.24). (R. 20-21). However, because plaintiff cold not perform the full range of sedentary work , the ALJ relied upon the vocational testimony, that plaintiff was capable of working as a clerk, telephone order clerk, security monitor or information clerk, all of which were jobs available in the national economy in large number. (R. 21).

### Applicable Legal Standards

To qualify for SSI, a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." **42 U.S.C. § 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. § 416.972.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged

to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *See Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. § 416.920(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff is in fact disabled, but whether ALJ Craig's findings were supported by substantial evidence; and, of course, whether any errors of law were made. *See Books v. Chater*, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997).** Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence. *Sample v. Shalala*, **999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. *Garfield v. Schweiker*, **732 F.2d 605 (7th Cir.1984).** If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the

burden shifts to the Commissioner at step four to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).**

## Analysis

Plaintiff does not make reference to the five-step analytical framework; rather, her focus is on the alleged points of error. Plaintiff does not take issue with ailments that were deemed severe, or the exclusion of other ailments, such as obesity or migraine headaches. Plaintiff acknowledges that Dr. Richardson's January 2005 assessment reflects that plaintiff is essentially limited to sedentary work, albeit with multiple restrictions. Therefore, this Court's analysis will assume a basic ability to perform sedentary work, and focus the ALJ's analysis of what additional restrictions are warranted and the ultimate question of disability.

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." **20 C.F.R. § 416.967(a).**

Dr. Richardson's January 2005 assessment indicated that plaintiff could lift and carry five pounds frequently and ten pounds occasionally, stand/walk up to one-third of the workday, sit up to two-thirds of the workday, and occasionally (up to 1/3 of the workday) perform reaching, handling, and fingering with each hand, climb, and balance, but she could rarely stoop, crouch, or crawl. (R. 367-68). Plaintiff had further restrictions on exposure to temperature extremes, humidity, and vibration; she needed to lie down during the workday to alleviate her

symptoms, and would miss work about three times a month due to her impairments and/or treatment.  (R. 368). Dr. Richardson also thought plaintiff could stand and sit alternately for four to five hours in an eight hour day, but could not complete a 40 hour work-week on a sustained basis.  (R. 368).  Vocational experts Barnes and Latto both opined that,  if Dr. Richardson's 2005 assessment were fully applicable, the claimant could not perform sustained work activity. However, depending on which of the restrictions were removed, some work would be possible. Both experts concluded that the need to lie down during the workday to alleviate symptoms and missing work about three times a month would both preclude work.   The ALJ did not attribute those restrictions to plaintiff.

Usually, a treating source's opinion is given more weight if there is a treating relationship, but such opinions must be supported by objective medical findings and not be inconsistent with other substantial evidence in the record.  20 C.F.R. § 416.927(d)(2).

In relevant part, the ALJ found that the objective evidence in the record failed to support plaintiff's subjective allegations of disability; therefore, plaintiff's testimony was deemed not fully credible.  ALJ Craig stated, "While the claimant may experience some back pain with strenuous activity, the record demonstrates she has done fairly well postoperatively with improved pain level.  (Doc. 19).  The following factors cited by the ALJ are of particular relevance: in November 2003 plaintiff was apparently able to paint her home; in November 2003 additional lumbar surgery was not advised due to inconsistencies with testing versus objective findings; there has never been a need for assistive devices; there is a lack of reported side effects from medication; and the absence of notations in the record reflecting restrictions on activity.

Although plaintiff may disagree with the ALJ's residual functional capacity assessment,

such determinations are reserved exclusively to the Commissioner (20 C.F.R. § 404.1527(e)). With that said, an ALJ may not disregard evidence when there is no contradictory evidence. *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993). From this Court's perspective, that is the crux of the problem with the ALJ's decision in this case. "[O]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

An October 2002 lumbar MRI was deemed consistent with subjective complaints and clinical findings of lumbar pain radiating down the right leg. At that time, it was suggested that additional surgery would not likely end plaintiff's pain, but she still opted for surgery because she found her situation intolerable. Consistent with that prediction, a postoperative MRI in May 2003 suggested ongoing nerve damage. A May 2005 MRI was consistent with plaintiff's complaints of pain, and a June 2005 neurology consult confirmed radicular syndrome and suggested a surgical consult because all other modalities had failed. The ALJ appears to have "cherry-picked" slight variations in phrasing, while ignoring consistency in the record as a whole regarding radiculopathy. Thus, there is consistent objective evidence in the record of her principal impairment.

It is undisputed that there are no specific physical restrictions in the medical record. Although there are consistent complaints of pain, the medical notes do not elaborate in any detail. The only detailed descriptions of the impact of plaintiff's ailments is her own testimony. Therefore, the ALJ's credibility takes on added importance. The fact that pain medication was consistently prescribed and the absence of any suggestion by her physicians that plaintiff was

exaggerating her pain is surely telling.

When plaintiff's medical history is viewed as a whole, it is striking that between August 2002 and January 2006 there are only two brief periods of sustained improvement where plaintiff was stable on medication and doing well by all accounts. The first was for approximately three months between May and July 2003, when plaintiff attempted newspaper delivery; however even during that time period she simultaneously complained her medication was not giving her good pain coverage. The second period was for approximately five months, from May 2004 through the later part of September 2004, but by late September plaintiff began complaining of worsening pain. These two fleeting periods of relative stability during the relevant three-and-one-half year period are akin to failed work attempts, and amount to no more than a scintilla of evidence of the caseation of disability or lack of credibility.

Furthermore, as observed in *Carradine v. Barnhart*, 360 F.3d 751, 753 (7ᵗʰ Cir. 2004), "pain can be severe and disabling even in the absence of 'objective' medical findings, that is test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant." Although there are slight variations in medication and test results, those variations never seem to remove plaintiff from her chronic cycle of pain that plaintiff described as eight-to-nine on a ten scale, and which would correspond with the narcotic pain relievers prescribed. Although adjectives such as mild, moderate and small are consistently used to characterize plaintiff's lumbar situation, there are no notations that her pain is disproportionate or faked.

Again, this Court finds this case similar to *Carradine v. Barnhart*, in that the ALJ's credibility determination– normally conclusive-- was based on errors of reasoning. The long

period over which plaintiff's complained of pain and sought and received treatment cannot be dismissed, as it refutes the smattering of positive notations in the record relied upon by the ALJ. Therefore, as in *Carradine v. Barnhart*, remand is warranted.

## Recommendation

For the aforestated reasons, this Court recommends that plaintiff Angela Dickerson's motion for summary judgment (Doc. 12) be granted and her appeal (Doc. 2) be granted, in that this action should be remanded to the Social Security Administration for further proceedings. Remand should be in accordance with "sentence four" of 42 U.S.C. § 405(g), due to an insufficient review of the evidence.

**DATED: February 4, 2008**

**s/ Clifford J. Proud_____**
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

## Notice of Response Deadline

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(e), the parties shall file any objections to this report and recommendation on or before **February 22, 2008.** No extensions will be granted.